UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | 08 Cr. 420 (SCR) |
| *v.* | : | |
| | : | MEMORANDUM DECISION |
| JOSE BRITO, | : | AND ORDER |
| | : | |
| Defendant. | : | |

―――――――――――――――――――――――――――:

**STEPHEN C. ROBINSON, United States District Judge.**

Jose Brito has been charged with two counts of violating the laws of the United States. The indictment charges that, on March 21, 2008, Mr. Brito, along with several other individuals, distributed and possessed with intent to distribute cocaine and also entered into a conspiracy to violate the narcotics laws, both in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C). Following his arrest, Mr. Brito made several statements to a police officer while in the custody of the City of Yonkers Police Department.  Mr. Brito has filed a motion, among other things, to suppress those statements, and, on November 27, 2008, the Court held an evidentiary hearing. On December 8, 2008, the parties submitted simultaneous memoranda addressing the legal issues raised by the testimony presented at the hearing, and Mr. Brito submitted a supplemental memorandum on December 9, 2008.

For the reasons set forth in this opinion, the Court grants in part and denies in part Mr. Brito's motion to suppress.

# I

# BACKGROUND

## A. Facts

On March 20, 2008, a confidential informant (the "CI") working with the City of Yonkers Police Department met an individual later identified as Jose Brito outside of the Yonkers Motor Inn (the "Inn"), in Yonkers, New York.  After the meeting, the CI informed police officers that Mr. Brito had told him that he (Mr. Brito) had three kilograms of cocaine to sell.  The following day, March 21, 2008, the CI, under the supervision of law enforcement officers, called Mr. Brito to arrange a purchase of the three kilograms of cocaine.  The CI and Mr. Brito agreed to meet at the parking lot of the Inn.

The CI then met with Mr. Brito in the parking lot, and law enforcement officers observed him getting into Mr. Brito's car.  Shortly thereafter, the CI called an officer working with the Drug Enforcement Administration Task Force (the "Task Force") as well as an undercover Task Force officer.  The CI confirmed that Mr. Brito had told him that the drugs would be arriving shortly.  The CI then called the Task Force officers to tell them that the drugs had arrived in a second car.

The undercover officer left the guest room at the Inn wearing a concealed recording device, and he entered the second car.  Inside the car were the CI, Mr. Brito, and a third-man later identified as Juan Deoleo.  After discussing the details of the drug purchase, Mr. Brito took the undercover officer to the second car, which was being driven by an individual later identified as Jason Anderson.  Mr. Brito bent over the front seat and retrieved what appeared to be three kilograms of cocaine.  Mr. Brito and the undercover officer discussed the details of the drug purchase, and Anderson confirmed that the drugs were good.

Thereafter, the undercover officer exited the second car, and Mr. Brito, Anderson, and Deoleo were arrested. The three kilograms of cocaine were field tested; one of the kilograms did not test positive for cocaine, and the second and third kilograms tested positive in certain places and negative in others.

## B. Procedural History

On the basis of this alleged conduct, Mr. Brito was indicted on two counts of violating the laws of the United States. The indictment charges that, on March 21, 2008, Mr. Brito, along with several other individuals, distributed and possessed with intent to distribute crack cocaine and also entered into a conspiracy to violate the narcotics laws, both in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C). Following his arrest, Mr. Brito made three sets of statements to Jose Pina, a detective with the City of Yonkers Police Department.

On September 15, 2008, Mr. Brito filed a motion seeking to suppress those statements and seeking immediate disclosure of *Brady*,[1] *Giglio*,[2] Rule 16 discovery, and Rule 404(b) evidence. In connection with his motion to suppress, Mr. Brito originally submitted an affidavit stating that "[a]t no time during this period did the agents read me any rights prior to speaking with me." Affidavit of Jose Brito ("Brito Aff.") ¶ 3. Despite this claim, it appears from the testimony presented at the November 27, 2008, evidentiary hearing and from the post-hearing legal memoranda that Mr. Brito has changed course—claiming that he *was* read, but did not waive, his *Miranda* rights. The Court turns to that testimony now.

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).
[2] *Giglio v. United States*, 405 U.S. 150 (1972).

### C.  Suppression Hearing

At the December 8 evidentiary hearing, the Government called as a witness Detective Jose Pina.  Detective Pina testified that, on March 21, 2008, he, along with Detective Louis Venturino, interviewed Mr. Brito at the headquarters of the City of Yonkers Police Department.

According to Detective Pina, he advised Mr. Brito of his *Miranda* rights as soon as Mr. Brito was brought into an interview room.  In advising Mr. Brito of his rights, Detective Pina used a U.F.-76 "Warning of Rights Card," which contains the *Miranda* warnings and is issued by the City of Yonkers Police Department.  The card lists the five warnings under the heading, "Rules of Interrogation":

1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.
5. You can decide at any time to exercise these rights and not answer any questions or make any statements.

Gov't Exh. I.   Immediately below these warnings, appears the heading, "Waiver," and immediately below that are written the following two questions:

1. Do you understand each of these rights I have explained to you?
2. Having these rights in mind, do you wish to talk to me/us now?

*Id.*

Detective Pina testified that he read to Mr. Brito each of the five warnings, one at a time. After reading each warning, Detective Pina paused to ask Mr. Brito if he understood the warning that he had been read.  Each time, Mr. Brito answered, "Yes."  At no point did Mr. Brito indicate that he wanted to stop the questioning or to speak to his lawyer.  After reading the five warnings

to Mr. Brito and having received Mr. Brito's assurances that he understood each warning, however, Detective Pina did not ask Mr. Brito whether Mr. Brito wished to waive these rights.

Instead, Detective Pina asked Mr. Brito "if he wanted to cooperate with this investigation, if he wanted to speak to us regarding this investigation." Suppression Hr'g Tr. ("Hr'g Tr.") 12, Dec. 8, 2008. In response, Mr. Brito inquired about the charges against him. Detective Pina explained that "he was being charged for delivering three kilograms of cocaine to an undercover officer." *Id.* Mr. Brito asked, "[W]ell, that's now, but how about after the drugs are analyzed?" *Id.* Detective Pina explained to Mr. Brito that he was "still going to get charged with at least two kilograms of cocaine."[3] *Id.*

Detective Pina then informed Mr. Brito that he (Detective Pina) was assigned to the DEA Task Force and that federal authorities were handling the case. Mr. Brito remarked, "[F]ederal, I know the federal system. My attorneys will take care of this." *Id.* Detective Pina told Mr. Brito that the charges against him were serious and that he was facing a great deal of time in prison and then asked him whether he would cooperate further with the investigation. Mr. Brito responded, "I ain't like that. I don't give . . . up people." *Id.* at 14. At that point, Detective Pina asked Mr. Brito if he would sign the *Miranda* warning card, to which Mr. Brito responded, "I'm not signing fuckin' nothing." *Id.* After this, the interview, which Detective Pina estimates lasted about fifteen minutes, ended.

Detective Pina and Detective Venturino then began to interview Deoleo and Anderson, the other individuals arrested at the Inn. About ten to fifteen minutes after Mr. Brito's interview ended, the detectives were escorting Deoleo out of the bathroom, and Mr. Brito shouted, "Don't say anything to them. My attorneys will take care of us." *Id.*

---

[3]   At the hearing, Detective Pina testified that, prior to the interview of Mr. Brito, Detective Lieutenant Kevin Tigue of the Narcotics Unit had told him that only two of the three kilograms had testified positive for cocaine and that the third kilogram was a "sham." *Id.* at 13.

Later that day, Detective Pina was informed by one of the Yonkers Police Department detectives that Mr. Brito had serious prior charges, including a robbery charge.  In a common hallway outside of the holding cells, Detective Pina told Mr. Brito that a criminal history search had revealed that Mr. Brito had serious prior charges, including robberies.  Mr. Brito responded, "Look, you know, I had, I had a previous robbery and kidnapping charges.  It got dropped down.  The victims didn't show up."  *Id.*  Mr. Brito also stated, "[Y]ou know, I'm not a bad guy.  I only robbed drug dealers.  I don't rob good people."  *Id.* at 15.  Finally, Mr. Brito explained that the victims had not shown up in the previous robbery case because they were drug dealers.

## II

## DISCUSSION

Mr. Brito seeks to suppress the first and third sets of statements made by Mr. Brito.[4]  Mr. Brito contends that the first set of statements[5] must be suppressed because it was "elicited from Mr. Brito without a valid waiver of his right to remain silent."  Defendant's Letter Brief ("Def. Br.") at 8.  Mr. Brito submits, moreover, that the totality of the circumstances demonstrates that he did not implicitly waive his right to remain silent.  Instead, Mr. Brito characterizes the dialogue with Detective Pina as a negotiation of sorts, in which he was seeking additional information prior to deciding whether to waive his rights.  Indeed, Mr. Brito notes that the interview ended because of his statement that he "didn't give . . . up people," Hr'g Tr. 14, and because he refused to sign the *Miranda* warning card.  With respect to the third set of

---

[4]  Mr. Brito concedes that the second statement—Mr. Brito's instruction to Deoleo, "Don't say anything to them.  My attorneys will take care of us," Hr'g Tr. 14—was a spontaneous statement that was not precipitated in any way by law enforcement personnel.

[5]  Included in the first set of statements are Mr. Brito's inquiry about the charges against him, his statement, "[W]ell, that's now, but how about after the drugs are analyzed," and his statement, "[F]ederal, I know the federal system.  My attorneys will take care of this."  Hr'g Tr. 12-14.

statements,[6] Mr. Brito contends that they must be suppressed because Detective Pina attempted to solicit incriminating statements from Mr. Brito after Mr. Brito had invoked his right to remain silent by refusing to continue with the interview or to cooperate.

The Government believes that Mr. Brito implicitly waived his *Miranda* rights by not invoking his rights and by voluntarily speaking to the detectives.  After being asked whether he wanted to cooperate, Mr. Brito did not invoke his right to remain silent, but instead asked what the charges against him were and then asked Detective Pina whether the charges against him would change after the drugs were analyzed.  The Government also submits that Mr. Brito's statements were not the product of interrogation; it argues that all of the statements were made voluntarily and not in response to express questioning "or its functional equivalent."  *See generally Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  The Court shall address each of these arguments after setting forth the relevant legal background.


**A.  Governing Legal Principles**

Because there is no dispute that Mr. Brito was in custody, that he was read his *Miranda* rights, or that he understood those rights, the Court begins its discussion with the principles governing waiver.  Generally, waiver is defined as "an intentional relinquishment or abandonment of a known right or privilege."  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  "[T]he relinquishment of the right," the Supreme Court of the United States has explained, "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Once a

---

[6]  Included in the third set of statements are the following statements:  "Look, you know, I had, I had a previous robbery and kidnapping charges.  It got dropped down.  The victims didn't show up"; "[Y]ou know, I'm not a bad guy.  I only robbed drug dealers.  I don't rob good people"; and Mr. Brito's admission that the victims had not shown up in the previous robbery case because they were drug dealers.  Hr'g Tr. 14-15.

suspect is informed of his *Miranda* rights, he may waive those rights either expressly or implicitly. *North Carolina v. Butler*, 441 U.S. 369, 375-76 ("[A]n explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case."); *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990) ("In at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." (internal quotation marks and citations omitted)). Whether a suspect has implicitly waived his *Miranda* rights is determined on a case-by-case basis from the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *United States v. Gaines*, 295 F.3d 293, 297-98 (2d Cir. 2002). Ultimately, the Government bears the burden of proving "by a preponderance of the evidence that the defendant relinquished his rights voluntarily with a full awareness of the rights being waived and the consequences of doing so." *Gaines*, 295 F.3d at 298. With these principles in mind, the Court turns to the first set of statements made by Mr. Brito.

## B.  Mr. Brito's Motion to Suppress Statements

### 1.  First Set of Statements

Any analysis of waiver in this case must begin with the observation that the parties do not dispute that Mr. Brito was informed of, and understood, the *Miranda* warnings that Detective Pina read to him. Indeed, Detective Pina, after reading each of the five *Miranda* rights individually, stopped to ask Mr. Brito whether he understood each particular right, and Mr. Brito answered "yes" each time. After Mr. Brito indicated that he understood the final right, Detective Pina asked him (for the first time) whether he wanted to cooperate in the investigation.

Mr. Brito's response is notable, both for what it communicated and for what it did not communicate.   Upon hearing Detective Pina's question, Mr. Brito did not remain silent or indicate that he wanted to exercise his right to remain silent or his right to have an attorney present.   Rather, Mr. Brito inquired as to the charges against him, thus suggesting that he wanted to engage Detective Pina in a colloquy about his case.   Detective Pina told him that he was being charged with delivering three kilograms of cocaine to an undercover officer.   Again, Mr. Brito's response is notable both for what it communicated and for what it did not communicate.   Once again, Mr. Brito did not choose to remain silent or indicate that he wanted to exercise any of the rights of which he had just been informed.   Mr. Brito asked, "[W]ell, that's now, but how about after the drugs are analyzed?"   *Id.*   Assessed in the best light to Mr. Brito, his statement suggests that he was willing to discuss with Detective Pina the evidence involved in the investigation; a more realistic assessment is that Mr. Brito thought that he had somehow outwitted law enforcement authorities.   Either way, his response to Detective Pina, contrary to Mr. Brito's contention, does not suggest that Mr. Brito was attempting to solicit "additional information prior to deciding whether to waive his rights."   Def. Letter Br. at 9.   Mr. Brito's conduct until this point demonstrates that he was choosing not to exercise any of his *Miranda* rights but was willing to engage Detective Pina in a dialogue about the investigation.   *See United States v. Dosanjh*, No. 08 Cr. 211, 2008 WL 5209991, at *5 (S.D.N.Y. Dec. 11, 2008) (finding implied waiver where the "[d]efendant understood her rights, but nevertheless responded to [the officer's] comments and questions").   Indeed, after Detective Pina informed Mr. Brito that Mr. Brito would "still . . . get charged with at least two kilograms of cocaine" by the federal authorities, Mr. Brito remarked that he knew the federal system and that his "attorneys w[ould] take care" of the case.   *Id.*   It was only after engaging in the foregoing colloquy with Detective

Pina and after Detective Pina asked him a second time to cooperate did Mr. Brito state that he would not cooperate with the investigation.

All of Mr. Brito's actions and words up to this point indicate that his statements were voluntary—that is, "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Burbine*, 475 U.S. at 421; *see also Scarpa*, 897 F.2d at 68 ("In at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." (internal quotation marks and citations omitted)). Mr. Brito's actions and words do not suggest any hesitation about speaking to Detective Pina or any desire to invoke his right to remain silent. *See United States v. Montana*, 958 F.2d 516, 519 (2d Cir. 1992) (noting that the suspect "had indicated his willingness to be interviewed by initiating the conversation"). Nor was Detective Pina questioning Mr. Brito in an aggressive or coercive manner—he merely asked Mr. Brito whether Mr. Brito wanted to cooperate and answered Mr. Brito's questions. *See Dosanjh*, 2008 WL 5209991, at *5 (noting that officers were not aggressive in questioning in finding an implied waiver). The Court therefore holds that the Government has met its burden of establishing beyond a preponderance of the evidence that Mr. Brito implicitly waived his right to remain silent for purposes of the first set of statements. Consequently, these statements will not be suppressed, and the Court turns to the third set of statements made by Mr. Brito.

### 2. Third Set of Statements

The Court believes that Mr. Brito did not implicitly waive his *Miranda* rights for purposes of the third set of statements. These statements were made directly in response to Detective Pina's comments to Mr. Brito regarding Mr. Brito's prior criminal history. Prior to Detective Pina's comments, however, Mr. Brito had indicated that he would not cooperate with

the investigation and also had categorically refused to sign the *Miranda* warning card. Following this conduct, Detective Pina ended the interview, thus indicating that Detective Pina sensed that Mr. Brito was not willing to talk further.  Although a refusal to cooperate does not necessarily entail a refusal to talk, Mr. Brito's comment to Deoleo while Deoleo was being escorted back to an interview room is probative of Mr. Brito's state of mind.  Mr. Brito shouted to Deoleo, "Don't say anything to them.  My attorneys will take care of us."  Hr'g Tr. at 14. Accordingly, by the time that Detective Pina made the comments to Mr. Brito regarding his criminal history, Mr. Brito had indicated that he was unwilling to cooperate in the investigation, refused to sign the *Miranda* waiver card, and directed Deoleo to exercise his right to remain silent.  Given Mr. Brito's words and conduct preceding the third set of statements and given that the Government bears the burden of establishing waiver, the Court cannot find that Mr. Brito's waived his right to remain silent for purposes of these statements.

The Government contends that Mr. Brito's statements were not the product of interrogation but rather were voluntary.  In *Rhode Island v. Innis*, the Supreme Court defined "interrogation," for purposes of *Miranda*, as "express questioning or its functional equivalent." 446 U.S. at 301.  The functional equivalent of express questioning, the Court explained, is "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.*; *see also Daniel v. Conway*, 498 F. Supp. 2d 673, 680 (S.D.N.Y. 2007) (explaining that "[a]n incriminating response is any response that the prosecutor may seek to introduce at trial, whether inculpatory or exculpatory").  In this case, Detective Pina told Mr. Brito that a criminal history search had revealed that Mr. Brito had a serious criminal history, including a robbery charge.  Plainly, Detective Pina intended his

comment about Mr. Brito's criminal history to elicit a response or cooperation from Mr. Brito after Mr. Brito already had indicated that he was unwilling to cooperate further.[7]

In this regard, the cases on which the Government relies are distinguishable.  In each of those cases, the courts determined that the suspect had not been subjected to interrogation because it was the suspect himself who, unprompted, had initiated the conversation.  *See United States v. Cota*, 953 F.2d 753, 759 (2d Cir. 1992) ("Cota's subsequent statements in the car on the way to arraignment were also not the product of custodial interrogation.  Nor were they solicited in any way.  As [the agent] testified at trial, Cota as the one to initiate the discussion . . . ."); *United States v. Guido*, 704 F.2d 675, 677 (2d Cir. 1983) ("Guido's statement was not the product of interrogation.  While the agents did suggest that Guido cooperate in the investigation, they apparently also told him he should discuss this possibility with his attorney, and they indicated that Guido would not be questioned about the case at this time.  There is no indication that the agents' conduct was designed to elicit an incriminating response."  (internal quotation marks and citation omitted) (emphasis added)); *Annuci*, 2007 WL 1310156, at *5 ("The conversation that preceded Defendant's incriminating statement was initiated by the Defendant himself.").  Here, Detective Pina initiated the conversation about Mr. Brito's criminal history, presumably in an effort to change tactics and persuade Mr. Brito that it was in his interest to cooperate in light of his serious prior charges, given that Mr. Brito already had indicated that he did not want to cooperate.  Consequently, the Court concludes that Mr. Brito was interrogated for purposes of *Miranda*, and therefore Mr. Brito's third set of statements shall not be suppressed.

---

[7]   Although the Detective Pina testified that his conversation with Mr. Brito about Mr. Brito's prior criminal history was "just a comment," Hr'g Tr. at 25-26, the Court finds from the totality of Detective Pina's testimony that Detective Pina's purpose in initiating this conversation with Mr. Brito, after Mr. Brito had already refused to cooperate or talk further, was to elicit a response or cooperation from Mr. Brito.  Indeed, Detective Pina testified that the sole reason that he was at the Yonkers Police Department headquarters was "for the purpose of interrogating" Mr. Brito, Deoleo, and Anderson.  *Id.* at 19.

## C. Discovery Requests

The Court denies Mr. Brito's request for an order requiring the Government to disclose forthwith *Brady*, *Giglio*, and Rule 16 discovery as well as early disclosure of Rule 404(b) evidence.  The Government has represented to the Court that it has complied, and will continue to comply, with its *Brady* obligations and that it will turn over *Giglio* and Jencks Act, 18 U.S.C. § 3500, materials in time for effective use.  *See In re United States v. Coppa*, 267 F.3d 132, 147 (2d Cir. 2001) ("We reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."); *United States v. Trippe*, 171 F. Supp. 2d 230, 237-38 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act Material, that is, at least one day before the Government witness is called to testify.").  Finally, the Government has indicated that it will make the required disclosure two weeks prior to trial, a practice that typically comports with Rule 404(b).  *See United States v. Fennell*, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007).

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Mr. Brito's motion to suppress.  The Clerk of the Court is directed to close docket entry number 17.

*It is so ordered.*

Dated: ___December 22___, 2008

     White Plains, New York

                                            Stephen C. Robinson
                                            United States District Judge